JAMES H. ARTMAN V. THE KANSAS CENTRAL RAILWAY COMPANY.

1. PRESUMPTION, *as to Adult Person.* Every adult is presumed to be endowed with sufficient reason to enable him to exercise ordinary prudence, and the law demands of every such person the employment of all reasonable means to foresee and prevent injury.

2. DAMAGES FOR PERSONAL INJURIES; *Contributory Negligence; Practice.* A. conveyed by deed to a railway company a right of way through his farm for the railroad of the grantee, said farm lying on both sides of the strip granted. The deed contained this clause: "Said second party [the railway company] agrees to build a wagon-road across said railroad on each of the tracts of land conveyed, at such convenient points as said first party [A.] may elect." The railroad company accepted the deed, had it recorded, entered into possession of the strip of land, constructed its railroad thereon, commenced to construct one wagon-road at a point designated on the strip by A., and then left it in an unfinished and incomplete condition—so much so, that A. stated in his testimony he did

not consider it a crossing at all. No sufficient grading was had at the place; an empty wagon could be driven over, if care was used, but it was dangerous to cross with a load. A., well knowing the danger of crossing, and being familiar with the ground, attempted in daylight to cross with his team and wagon. On his wagon was a hay-frame, partially filled with hay and corn, and containing three children, himself, and another adult person. As the wagon was leaving the track, the horses started, on account of the wagon or rack shoving forward against them, from the grading not being in good shape, and ran away, injuring themselves, the harness and wagon, and causing serious and permanent injuries to A. *Held*, That in an action by A. against the railway company for damages for such injuries, on the proof of these facts, A. is not entitled to recover, and the trial court might rightfully and properly sustain a demurrer interposed by the defendant to the evidence of plaintiff.

## *Error from Atchison District Court.*

THIS action was brought to recover damages for personal injuries, which the plaintiff in error ( plaintiff below) alleged he received while crossing the railroad of the defendant in error (defendant below), in Atchison county, on or about October 2, 1875. On January 27, 1872, the plaintiff, with his wife, executed a deed to the defendant, conveying a right of way for a single or double-track railway through their lands in said county. The deed recited that said plaintiff and wife, for and in consideration of the location of the defendant's railway through and on the lands described in the deed, and of one hundred dollars, granted and conveyed the right of way. The deed contained this clause:

"Said second party, the Kansas Central Railway Company, agrees to build a cattle-guard where said railroad crosses the north line of the second tract above described, and to build a wagon-road across said railroad on each of the above-described tracts at such convenient points as said first party [the plaintiff] may elect."

The grantee accepted the deed, had it recorded, entered into possession of the strip of land, and constructed a railroad thereon. The petition alleged that long prior to October 6, 1875, the plaintiff elected and designated the places at which he wished to have the railway company build and construct the wagon-roads across the railroad on the land

conveyed by him; that the defendant neglected its duty, and refused to build or maintain any wagon-roads whatever upon the land; that on or about October 2, 1875, while he was lawfully pursuing his business in the use and enjoyment of his premises, and while crossing the railroad track at a place designated for the construction of the wagon-road, he was greatly injured and damaged; that his wagon was upset and broken, his team frightened so that it ran away, and that he sustained damage to the full sum of $3,800. On the trial the plaintiff testified as follows:

"I am the plaintiff in this action, and own the premises mentioned in the petition, and was the owner of them in 1872. I have resided there about ten years. The map now here gives a correct representation of the premises. I recollect when the line of the defendant's railroad was located there. A man by the name of McDowell was the only person I saw there engaged in getting the right of way for the railroad. I am the J. H. Artman whose name is signed to the deed annexed to the petition. The section-boss who had charge of the work of making this crossing was Mr. Allen. Since the building of that road, there has been no other crossing made or commenced on this 32-acre piece of land except the one spoken of here, and there never has been a completed crossing at that point. After the road was completed, it ran along a good while, and I had been at them several times to fix me a crossing, and finally, along in the latter part of 1873 or fore part of 1874, Mr. Allen told me to stake it off, and I did so. I saw him a few days after, and he said he would fix it. I went with him, and showed him the place where I wanted it. He wanted to make it further down the field. I said I did not care, so it was not much further down. He said he had not got the lumber to fix it right, but for me to furnish the stringers, and he would make me a decent crossing. I went to the timber and got some stringers, and they went to work and put on what lumber they had, but they did not have enough to finish it. They cut some of the boards in two, but still did not have enough. It went on in that condition, and finally Mr. Allen was taken off the road, and Mr. Boggs came along as section-boss, and I got after him to fix it. There were two or three boards at another place between the rails that were never used, and I told him to take them and fix it. It went along two or three

months, and as I was passing along I saw that those boards had been taken up, but what was ever done with them I don't know. There were some boards put in the crossing at the public road that looked like them, and that crossing on my place remained in the same condition. My business is farming, and I have been at it ever since I was big enough to do anything. In making use of the land where I live, it is necessary for me to cross the track of the railroad. There has never been a good wagon-road leading upon the railroad track since the road was built; there was one commenced, as I have explained, but it was never completed. It was a little better on the east side, and I could cross it with an empty wagon — in fact did cross it.

"The time I was injured, which was on Saturday evening, I had been stacking hay till late. At noon the little boy spoken of wanted to go down to the timber for some hazelnuts, and his little sister went with him. After we got through our work, we put on two or three shocks of hay and seventy-five or a hundred ears of corn, and started home. I was driving, and came upon the crossing as usual. I had to be careful, and just as I got on the road and started down on the other side, the wagon twisted — I can't tell how — and the hay-frame must have struck the horses; and I did not have time to stop them, till I was thrown against the fence and bruised up and hurt. As near as I can tell, the wagon was just leaving the track when the horses started. The cause of the wagon or rack shoving forward on the horses, must have been from the grade not being in good shape. The hay, or something of that kind, was shoved forward upon the horses. I don't know how I got off the wagon, or how the rest got off. The first I remember was, I got up and saw Bob Young, and I asked him where my boy was, and commenced looking in the hay for him. The next thing I remember, I was up by the horses, where they had caught them. From there I got to the house someway; I don't remember much about it. I was put to bed, and Dr. Lane came and dressed my wounds. There was a gash clear across my arm, and they said they could see the main vein plainly; my head was cut across on the right side, and my right shoulder was hurt considerably; my collar-bone was cracked, and it was thought one of my ribs was broken. It must have been as much as a month or six weeks before I could get out of bed, and when I did get out, I could not raise my arm up, and to this day I can't use my arm as well as I could before

the injury. I suffered greatly, and could not lie down, but had to be propped up in bed, and was not able to turn myself in bed for the first two weeks. I paid the physicians for their services, but I don't know how much it amounted to. I don't remember of Dr. Coyle being there more than twice. I think Dr. Lane was there fifty times; he lived right at the station. During the first four weeks I was in bed, I was not able to take care of myself; my family and the neighbors took care of me. Dr. Coyle is now dead, and I don't know where Dr. Lane is. I have not been able to do any work on the farm to amount to anything since that accident."

(*Cross-examination.*) "Mr. McDowell was the man who was engaged in procuring the right of way out there; I did not take charge of that matter myself. I will explain all I did in the matter, if you will allow me. I don't remember ever crossing that place with a load, but I often crossed it empty. It was not safe to cross with a load. When I had a load, I went by the public road, but that was about three-quarters of a mile further. I discovered that place where there were two or three boards on the road some time after they commenced the other crossing. The boards put in between the rails at the crossing were twelve or fourteen feet long. They were of different lengths and widths, and seemed to be scrap lumber. On the east side there were boards enough, if they had been long enough, to have made a good crossing. There were boards between the rails, and one board outside the rails on each side, and there were no more boards for two or three feet, and then commenced the end of the stringers that went across the ditch. If the boards had reached clear across the ditches and had been long enough, it would have been a very good crossing, if they had graded it so as to get on and off the bridge across the ditches. It never would have been a complete crossing, the way they started it. It was a narrow, contracted road-way; there was no grading up to the end of the stringers. I never considered it a crossing at all. I spoke to Mr. Boggs several times about fixing that crossing, and also to Mr. Martin, the general superintendent of the road, about it, but he put me off, saying they were hard up. I furnished the stringers for that crossing, but I did not furnish anything else. Those stringers are not there now. They have been cut up and put under the ties. I commenced using that crossing soon after it was built, as it was built, and continued to use it up to the

time of this accident. I have crossed there maybe forty times empty. I think that was as much of a load as I ever had on before. I can't state just how I had the little child at the time I crossed; I was not paying much attention to it. I must have had it in front of me. I can't tell you just how I was holding the lines; generally I am careful in holding them; I certainly had hold of the lines. I was not showing my little child how to drive at that place. One of the horses I was driving that day I had owned for three years, and the other from the March before."

Other witnesses testified, on the part of the plaintiff, that the crossing had never been completed; that it was rough, almost impassable; that it was not a good crossing to get on or off. One witness testified that he never considered it a reasonably safe crossing; another, that a person might get on and off of it with an empty wagon, but not with a loaded one. Robert Young testified that he was present on the wagon at the time of the accident; that there were Mr. Artman, the children and himself on the wagon, with some hay, probably 300 pounds, and about a bushel of corn; that after putting the hay and corn on the wagon they started for home, and in crossing the railroad track just as they were going off the track, the team ran off—it ran up to the fence and made a turn and threw them all off; that they were coming from a southeast direction and going towards the northwest; the track was higher than the original surface of the ground, but he didn't remember that there was any filling, by which it was convenient to get upon the track, though they did get up; that they went up angling on and over the track, driving very slow; that his back was towards the horses, and he felt the start before he saw anything; he first noticed the starting of the team, as they were going down off the track; that they could not cross straight over that place, but had to go angling over it; that he had been over that place before with an empty wagon; it was not so they could cross it with a load. Mr. Wood testified that he had frequently seen the crossing, in passing along the public road; that he had never seen it in a finished condition—something

was always lacking; it was never graded up.   Mr. Artman engaged him to do his harvesting, in June, 1875, and he took his reaper behind his wagon and went down to the place to cross, but was not willing to risk it, and went down the track on the west side, and crossed where there was no crossing at all; that he might have crossed at this crossing if he had had a wagon alone, but with the reaper behind he did not care to try it—one reason was, that he would have to make some very short turns to get around the apron or bridge over the ditches, which he could not do with the reaper behind the wagon; it was impossible to go squarely on and off the crossing, but he would have to go obliquely on and off it; the ditches were some thirteen inches deep, and six or eight feet wide.   Wm. Wells testified, that he was standing at his house on the evening of the injury, at about five o'clock, and saw Mr. Artman and his family coming from the hay field; that he was looking at them about the time they came on the railroad, and saw the horses start; that he saw the hay fall off with the persons, and that he ran and caught the team; the horses were frightened, but were running slowly; that the reason they were running slowly was, that one of the children was fastened in the lines, and hanging over the front of the wagon and pulling against the horses.

After the plaintiff had closed his evidence, the defendant interposed a demurrer, upon the ground that no cause of action had been proved; the demurrer was sustained by the court, and judgment rendered against the plaintiff for all costs. The rulings of the court were duly excepted to, and the plaintiff now seeks a reversal of the judgment by proceedings in error.

*Everest & Waggener*, for plaintiff in error.

*E. Stillings*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: No cause of action was made out by the evidence, and the court properly sustained the demurrer.   If

the case had been submitted to the jury upon the testimony introduced by the plaintiff, and a verdict had been returned in his favor, we have no hesitation in saying that the court ought to have set it aside. The facts are not only undisputed, but admit of only one conclusion as to the negligence of the plaintiff. He was familiar with the right of way; the railroad track, and the dangers of crossing; he knew that an empty wagon could scarcely be driven over with safety, and yet, with this knowledge, with his eyes open as to the perils of trying to cross, he attempted to drive over with a hay-frame on his wagon, partially filled with hay and corn, and containing himself, three children and Mr. Young. Undoubtedly he hoped and expected to cross in safety, but it was a dangerous experiment, and one which was exceedingly unfortunate to him. His misfortunes naturally excite sympathy, but give no legal claim in this kind of action for damages. He was so negligent of his duty to himself, so wanting in care and diligence in his conduct, that the law will not afford him the relief which he seeks. Using the language of the counsel for defendant, we may say: "If he could drive over this place, knowing the crossing never to have been completed, and knowing such driving to be unsafe, and charge the railway company with the fruits of such imprudence, he could have gone across the same place without any part of the crossing having been made, and required the company to pay for the lives and property destroyed by such attempt." The plaintiff was guilty of ordinary negligence, to say the least, contributing directly to the injury, and of such negligence on his part as defeats a recovery.

Counsel for plaintiff urge in support of his claim for damages, that where a contract creates a duty, the neglect to perform that duty, as well as the negligent performance of it, is a ground of action for tort—hence it is at the election of the party injured to sue either on the contract or the tort; and then argue that, as the company accepted the deed, it was bound to construct the wagon-road in a reasonably safe manner, and having neglected to perform that duty, it was re-

sponsible for all injuries resulting to the plaintiff received by him in attempting to cross the road. The rule of law stated, as a general one, is correct, but the deduction attempted to be drawn therefrom for this case by counsel is not tenable. A party cannot, with his eyes open, imprudently and recklessly walk or drive into a dangerous culvert, or an uncovered pitfall, left by a railway company, where by contract or other duty it is required to cover it safely, and then, notwithstanding his want of ordinary care, recover for his personal injuries inflicted by falling into such culvert or pitfall. This theory would relieve a party thus receiving injury from the exercise of any care. Upon this theory, the greater the carelessness and the grosser the negligence of the person injured, the greater the liability of the company. This doctrine is unsound. Every adult is presumed to be endowed with sufficient reason to enable him to exercise ordinary prudence, and the law demands that every such person must employ reasonable means to foresee and prevent injury.

Notwithstanding the defendant is not liable in this action, the plaintiff had, long prior to this suit, his cause of action against the company for its refusal to build the wagon-roads on the pieces of land conveyed for right of way. He might, perhaps, have brought his action to compel the company to construct suitable roads. He certainly could have obtained pecuniary compensation, in the way of damages, for the breach of duty on the part of the company in not performing the conditions of the deed.

On account of the negligence of the plaintiff, the other allegations of error are immaterial, and need not be discussed.

The judgment of the district court will be affirmed.

All the Justices concurring.